AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
for the

District of Kansas

| | |
|---|---|
| United States of America<br>v.<br><br><br>ELIAS SHAMSALDEEN<br>*Defendant* | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.    26-mj-8127-JBW

Case No.: 1:26-mj-00068-FJS

## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*    ELIAS SHAMSALDEEN                                      ,
who is accused of an offense or violation based on the following document filed with the court:

❏ Indictment      ❏ Superseding Indictment      ❏ Information      ❏ Superseding Information      ☑ Complaint
❏ Probation Violation Petition      ❏ Supervised Release Violation Petition      ❏ Violation Notice      ❏ Order of the Court

This offense is briefly described as follows:

18 U.S.C. § 2339B - Conspiracy To Provide Material Support and Resources

Date:      06/04/2026

*Issuing officer's signature*

City and state:      Kansas City, Kansas

Honorable Jennifer B. Wieland, US Magistrate Judge
*Printed name and title*

| **Return** |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . <br><br> Date: _____          _____<br>*Arresting officer's signature*<br><br>_____<br>*Printed name and title* |

AO 442  (Rev. 11/11)  Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only
and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender:    ELIAS SHAMSALDEEN

Known aliases:

Last known residence:

Prior addresses to which defendant/offender may still have ties:

Last known employment:

Last known telephone numbers:

Place of birth:

Date of birth:

Social Security number:

Height:                                      Weight:

Sex:                                         Race:

Hair:                                        Eyes:

Scars, tattoos, other distinguishing marks:

History of violence, weapons, drug use:

Known family, friends, and other associates *(name, relation, address, phone number)*:

FBI number:

Complete description of auto:

Investigative agency and address:

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*:

Date of last contact with pretrial services or probation officer *(if applicable)*:

PER 18 U.S.C. 3170

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ INFORMATION   ☐ INDICTMENT   ☑ COMPLAINT

Matter Sealed:   ☐ Juvenile   ☐ Other than Juvenile

☐ Pre-Indictment Plea   ☐ Superseding   ☐ Defendant Added
                         ☐ Indictment   ☐ Charges/Counts Added
                         ☐ Information

Name of District Court, and/or Judge/Magistrate Location (City)

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS                Divisional Office

Name and Office of Person Furnishing Information on THIS FORM: Ryan A. Kriegshauser
☒ U.S. Atty   ☐ Other U.S. Agency
Phone No. _____

Name of Asst. U.S. Attorney (if assigned): Michelle McFarlane

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)
FBI Kyle A. Heitman

☐ person is awaiting trial in another Federal or State Court (give name of court)

☐ this person/proceeding transferred from another district per (circle one) FRCrP 20, 21 or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
   ☐ U.S. Atty   ☐ Defense

☐ this prosecution relates to a pending case involving this same defendant. (Notice of Related Case must still be filed with the Clerk.)

☐ prior proceedings or appearance(s) before U.S. Magistrate Judge regarding this defendant were recorded under

SHOW DOCKET NO.

MAG. JUDGE CASE NO.

Place of offense _____   County _____

---

CASE NO. 26-mj-8127-JBW

USA vs.

Defendant: ELIAS SHAMSALDEEN

Address: 1036 North Brandy Way
Porterville, CA 93257

☐ Interpreter Required   Dialect: _____

Birth Date 8/17/2004

☑ Male   ☐ Female
☐ Alien (if applicable)

Social Security Number 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

### DEFENDANT

Issue:   ☑ Warrant   ☐ Summons

Location Status:

Arrest Date _____ or Date Transferred to Federal Custody _____

☐ Currently in Federal Custody
☐ Currently in State Custody
   ☐ Writ Required
☐ Currently on bond
☐ Fugitive

Defense Counsel (if any): _____

☐ FPD   ☐ CJA   ☐ RET'D

☐ Appointed on Target Letter

☐ This report amends AO 257 previously submitted

---

## OFFENSE CHARGED - U.S.C. CITATION - STATUTORY MAXIMUM PENALTIES - ADDITIONAL INFORMATION OR COMMENTS

Total # of Counts _____

| Set | Title & Section/Offense Level (Petty = 1 / Misdemeanor = 3 / Felony = 4) | Description of Offense Charged | Felony/Misd. |
|---|---|---|---|
| | 18 U.S.C. § 2339B | Conspiracy To Provide Material Support and Resources | ☒ Felony ☐ Misdemeanor |
| | | | ☐ Felony ☐ Misdemeanor |
| | | | ☐ Felony ☐ Misdemeanor |
| | | | ☐ Felony ☐ Misdemeanor |
| | | | ☐ Felony ☐ Misdemeanor |

# UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**

   **Plaintiff,**

   **v.**

**BISAAM GHAFOOR,**
**BAREEN DZAYEE,**
   **and**
**ELIAS SHAMSALDEEN,**

   **Defendants.**

**FILED**

**Jun 05, 2026**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**CASE NO. 26-MJ-8127-JBW**

Case No.: 1:26-mj-00068-FJS

# CRIMINAL COMPLAINT

I, Kyle A. Heitman, being first duly sworn, hereby depose and state as follows:

## Introduction and Agent Background

1. I make this affidavit in support of a Complaint charging Bisaam Ghafoor ("Ghafoor"), Bareen Dzayee ("Dzayee"), and Elias Shamsaldeen ("Shamsaldeen") with, beginning by at least on or about February 1, 2025, and continuing at least through in or about June 5, 2026, the dates being approximate and inclusive, in the District of Kansas and elsewhere, conspiring to provide material support and resources to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B.

2.      I am a Special Agent with the FBI and have been so employed for the past seven years.  I am assigned to a counterterrorism squad with the Joint Terrorism Task Force in the Kansas City metropolitan area.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause and does not set forth all of my knowledge about this matter.

4.      From my participation in the investigation, including my review of FBI reports and recordings, I have learned the following information.

**Charge: Conspiracy To Provide Material Support and Resources
In Violation 18 U.S.C. § 2339B**

5.      Paragraphs 1 through 4 are incorporated herein by reference.

6.      Title 18, United States Code, Section 2339B prohibits, in pertinent part, a person from knowingly providing "material support or resources to a foreign terrorist organization," or attempting or conspiring to do the same.

7.      The term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel…, and transportation, except medicine or religious materials."  18 U.S.C. Section 2339A(b)(1) and Section 2339B(g)(4).  Section 2339B(h) provides that "[n]o person may be prosecuted under this section in connection with the term 'personnel' unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist

organization's direction or control or to organize, manage, supervise, or otherwise direct that operation of that organization. Individuals who act entirely independent of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control."

## Designated Foreign Terrorist Organization

8.      Paragraphs 1 through 7 are incorporated herein by reference.

9.      On or about October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224.

10.      On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the INA and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham (i.e., "ISIS"—which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO and SDGT listings: Islamic State, ISIL, and ISIS. On March 22, 2019, the Secretary added the following aliases to the FTO and SDGT listings: Amaq News Agency, Al Hayat Media Center, Al-Hayat Media Center, and Al Hayat. To date, ISIS remains a designated FTO.

## Defendants

11.      Paragraphs 1 through 10 are incorporated herein by reference.

3

12.     Ghafoor is a United States citizen living in Leawood, Kansas.

13.     Dzayee is a United States citizen living in Lakeside, California.

14.     Shamsaldeen is a United State citizen living in Porterville, California.

15.     Ghafoor, Shamsaldeen, and Dzayee agreed to provide material support and resources to ISIS.  Over years, the individuals communicated about several plans to support ISIS, including through the provision of personnel, services, and money.  Through chats, voice calls, and multiple messaging platforms, these conspirators pledged allegiance or "Bayat"[1] to ISIS and its leader.

16.     Ghafoor, Shamsaldeen, and Dzayee collectively provided approximately $2,040 to an individual they believed to be an ISIS member for the purpose of purchasing rocket-propelled grenades ("RPGs") and drones, which, in turn, the conspirators understood would be used to attack and kill U.S. servicemembers deployed overseas.

17.     Ghafoor, Shamsaldeen, Dzayee, and others communicated their desires to travel outside the United States to fight on behalf of ISIS.  The conspirators and others expressed a willingness to die on behalf of ISIS.

18.     In or about early March 2025, an individual previously unknown to the FBI reported a tip online regarding a particular social media user who posted content online about ISIS.[2]  This particular social media poster claimed online to have "pledged Bayat" to ISIS.

---

[1] I know from my training and experience that Bayyah, Bayyat, and Bayat are Arabic terms that mean pledge, or oath, of allegiance to a leader.  In the context of ISIS, I understand that when one pledges Bayat, the individual is attempting to place oneself under the direction and control of ISIS.

[2] The tipster has no known history of reporting on counterterrorism matters to law enforcement.  The tipster is motivated by patriotism and concern of the suspected activity.  The tipster had direct access to Ghafoor, Shamsaldeen, and others within a social media group.  The tipster responded to law enforcement's request for additional information. The tipster's information proved to be credible and was corroborated through other information obtained in the investigation.  The tipster has no known criminal history.

19.     Through legal process, the FBI learned the identity of the social media poster who claimed to have "pledged Bayat" to ISIS. The poster was identified to be Ghafoor.

20.     In or about March 2025, the same tipster identified another social media user who actively participated in a pro-ISIS group on the social media platform with Ghafoor and others. The group discussed desires to promote violence in furtherance of ISIS.  Through legal process, the FBI identified this additional social media user to be Shamsaldeen.

21.     In or about January 2026, the FBI identified another social media user who actively participated in a pro-ISIS group on the social media platform with Ghafoor, Shamsaldeen, and others.  This group discussed weapons, explosives, and encouraging violence in the name of ISIS. Through legal process, the FBI identified this third social media user to be Dzayee.

**Probable Cause**

22.     Paragraphs 1 through 21 are incorporated herein by reference.

23.     In or about May 2025, a confidential human source (hereinafter "CHS"[3]) communicated within the social media platform group with Ghafoor, Shamsaldeen, and others.  In the online group, Shamsaldeen expressed a desire to stab and injure a United States servicemember who was present at the same business location as Shamsaldeen.  Shamsaldeen told the group that his mother had encouraged her children to grow up and kill Americans.  Shamsaldeen explained he would play video games that included killing people and, when doing so, fantasized it was part of an attack.

---

[3] The CHS has an established history of reporting on counterterrorism matters to law enforcement.  The CHS is motivated by patriotism and monetary compensation. The CHS has had a relationship with the FBI since 2017.  The CHS provides timely information and had direct access to Ghafoor, Shamsaldeen, and Dzayee.  The FBI found the CHS's information to be credible and corroborated through recordings, screenshots, and other information from the investigation.

24. In or about August 2025, the tipster reported to the FBI that Shamsaldeen expressed a desire to travel overseas to fight for ISIS.

25. In or about August 2025, Shamsaldeen told the CHS that he wanted to "do something" and "he no longer wanted to just talk about it, and that he wanted to take action."

26. On or about August 15, 2025, Ghafoor told the CHS about Ghafoor concealing from his family his desire to travel overseas and fight with ISIS.

27. On or about September 1, 2025, Ghafoor told the CHS that he planned to get a job so he could make money to purchase an AK-47 and ammunition to start training for his fighting with ISIS.

28. On or about October 19, 2025, Shamsaldeen publicly pledged allegiance to the commander of ISIS, in which he attested to hear and obey all authorities of ISIS. Shamsaldeen shared his Bayat message with the CHS.

29. On or about October 28, 2025, Shamsaldeen sent the following message to an FBI Online Covert Employee ("OCE") regarding martyrdom.



**A.  Ghafoor and Dzayee provided money to the CHS.**

30.    Between on or about March 31, 2026, and April 10, 2026, Ghafoor and Dzayee communicated with the CHS.  Both Ghafoor and Dzayee believed the CHS was an active member of ISIS as the CHS portrayed themself as such.  Ghafoor and Dzayee talked about their money-making scheme and offered to send money to the CHS via cryptocurrency.  Below is a screenshot of Ghafoor (posting under the online name "PRINCE," according to the CHS) offering to help the CHS with cryptocurrency.



31.    On or about April 30, 2026, the CHS asked Ghafoor if Ghafoor was still willing to donate cryptocurrency to help the "brothers" and the "mujahideen."  Ghafoor responded by asking how much was needed.  The next day, Ghafoor told the CHS that Dzayee had the money that Ghafoor intended to give the CHS.  Ghafoor proclaimed to the CHS that, if Ghafoor had the money, he would give it to the CHS.  Ghafoor instructed the CHS to contact Dzayee and to tell Dzayee to take 10% of Ghafoor's share of the money and give that money to the CHS through cryptocurrency.  Ghafoor said he would message Dzayee to tell Dzayee that he authorized the transfer of funds to the CHS.

32.    On or about May 6, 2026, the CHS exchanged voice and text messages with Ghafoor and Dzayee.  As a follow-up to Ghafoor's offer to send money, the CHS mentioned an opportunity to support ISIS with buying drones to attack American military personnel overseas.

Dzayee suggested the military included U.S. Special Forces – Green Berets.  Ghafoor agreed to pledge money.  Ghafoor instructed Dzayee to give Ghafoor's share of their fraud proceeds located in joint holdings to the CHS.

33.    The CHS explained that "his group" would conduct the attack.  The CHS explained that the CHS would send a link to a cryptocurrency wallet where Ghafoor and Dzayee could send the funds.  Dzayee responded that the "donation" is plausible, but he did not want to be associated with the money being sent.  Dzayee suggested that this transaction will be considered as "charity."  Dzayee elaborated, in "my head it's charity." Based on my training and experience, I know ISIS supporters who provide material support and resources engage in operational security to hide true intentions. In this instance, I believe Dzayee suggested the money was "charity" as part of his operational security.

34.    Dzayee and Ghafoor were uncertain how to send the money without getting in trouble.  Ghafoor speculated about using an intermediary.  Dzayee expressed that he was not scared, but that he did not want to be in trouble.  Ghafoor and Dzayee mentioned that this action would be "bigger" than their fraud scheme and both considered it "treason."

35.    Ghafoor referenced someone else who had sent money to ISIS, and Dzayee corrected Ghafoor to call it "charity."  Ghafoor disagreed that they should use the term "charity" because no one was recording their conversation.

36.    Dzayee and Ghafoor strategized how to not have their names associated with the transaction for carrying out this operation.  They discussed using a cryptocurrency ATM and a particular cryptocurrency account to send the money.

37.    Ghafoor exclaimed it would be "sick"[4] if the CHS wrote Ghafoor's name on the drone.  Dzayee thought that image would be good for Ghafoor to use on a social media platform.

38.    On or about May 7, 2026, Ghafoor asked the CHS for the cryptocurrency wallet number, which the CHS provided.  Ghafoor told the CHS to use his real name of "Bisaam Shazad Ghafoor."  Ghafoor explained that he did not yet have the money as Dzayee still needed to forward Ghafoor's share of the money to Ghafoor.  Ghafoor reaffirmed that he located a cryptocurrency ATM and was just waiting on Dzayee to send the money.  Ghafoor explained part of the delay was Dzayee's efforts to use "proxies" to send the money to Ghafoor and Dzayee.  Ghafoor reiterated that Dzayee intended to keep his personal information distant from the transactions.

39.    On or about May 9, 2026, Dzayee told the CHS that he was at an ATM and attempting to send funds to the CHS.  Ultimately, the cryptocurrency never arrived but Dzayee sent the CHS screen captures about account issues with the ATM including the one below.

---

[4] I understood Ghafoor to be using the term "sick" as a slang for cool.



40.     On or about May 10, 2026, Ghafoor and the CHS texted each other.  Ghafoor commented, "funding a terrorist organization is 100% considered treason" and "I do care about Dawlah and that's why I want to send you the money."[5]

41.     Ghafoor explained that he and Dzayee would send the money to an intermediary via cryptocurrency and then the intermediary would send the money to the CHS.  Ghafoor suggested the process was not as "simple" as the CHS described because "this is how you get caught by feds."

42.     Ghafoor opined that the amount of money to be sent by Dzayee likely would be $250.  Ghafoor expressed embarrassment by giving such a small amount but claimed "we don't know how to transfer to you without getting caught."  When the CHS asked why Ghafoor could

---

[5] Based on my training and experience, and information known to me through this investigation, I understand the term "Dawlah" and "Dawla" to mean ISIS, which is the FTO at issue.

not send anything himself, Ghafoor responded that he did not possess the money as Dzayee held Ghafoor's money.

43.     On or about May 11, 2026, Ghafoor informed an FBI Undercover Employee ("UCE") that he had not yet identified a solution to send the money.  Ghafoor texted, "Just wanna send like 200 dollars to someone but don't wanna send it to them directly bc yk.  They are part of you know what group."  Ghafoor and the UCE discussed creating cryptocurrency wallets and transferring funds without getting caught.

44.     On or about May 12, 2026, Ghafoor and the UCE discussed options for Ghafoor to send cryptocurrency.  Ghafoor suggested meeting the UCE in-person and handing cash to the UCE so the UCE could convert the cash into cryptocurrency.  The UCE asked if the money was for ISIS.  Ghafoor responded, "it is."

45.     Ghafoor then stated he wished he could provide funds on a recurring basis.  The UCE and Ghafoor discussed plans to meet and Ghafoor provided a link for a mosque in Kansas City, Missouri.  Ghafoor asked the UCE if Dzayee could send Ghafoor money for "this express purpose." Based on my training and experience, context, and information known to me, I believe "this express purpose" means providing money to ISIS.

46.     On the same day, Ghafoor sent a message to the CHS explaining that Ghafoor planned to meet the UCE on Friday to give the UCE $250 cash.  The UCE agreed to convert the cash into cryptocurrency and then send the money to the CHS.

47.     On or about May 14, 2026, Ghafoor told the UCE that he had placed $250 in a wax-sealed envelope that Ghafoor addressed to a random mosque.  Based on my training and experience, I believe Ghafoor addressed the envelope to a random mosque as a matter of operational security. Ghafoor provided a cryptocurrency wallet address to the UCE; the same

11

cryptocurrency wallet address provided to Ghafoor by the CHS.  Ghafoor and the UCE agreed to meet the following day.

48.      On May 15, 2026, the UCE and Ghafoor met at the mosque in Kansas City.  During the meeting, Ghafoor gave the UCE a wax-sealed envelope addressed to an actual mosque in New Jersey.  Near the beginning of the meeting, the UCE asked Ghafoor the purpose of the money.  Ghafoor replied, "Yeah…it's not illegal…it's this chill guy" and ". . . he's going through like . . . heart cancer . . . you know what I'm saying?"  The envelope contained $250 cash.  The sealed envelope had writing in English and Arabic.  Later, Ghafoor confirmed to the UCE that the money was to support ISIS.  Ghafoor mentioned the transactions should be in smaller amounts so the transactions would not be suspicious and to prevent them from being caught by law enforcement authorities.

49.      Subsequently, Ghafoor decided to provide the UCE with additional cash.  When doing so, Ghafoor expressed disgust that someone gave him only $200.  The UCE clarified with Ghafoor that this money was in addition to what Ghafoor already gave the UCE. Ghafoor explained that he needed to access a financial application on his phone. Ghafoor then asked the UCE to follow him to a nearby bank.

50.      Ghafoor explained to the UCE that he needed to call Dzayee. Ghafoor called Dzayee in the presence of the UCE.  The UCE heard Ghafoor explain that he needed $250 and not just the $200 that had been sent.  From the overheard conversation, it sounded as though Dzayee provided more than $200 to an intermediary to assist with transferring the funds, but the intermediary, or "helper"—as Ghafoor referred to the individual—only sent $200. Ghafoor and the UCE drove in their separate vehicles to a nearby bank.

51.    At the bank, Ghafoor drove his vehicle through the ATM lane.  Ghafoor conducted a transaction at the ATM and then parked next to the UCE's vehicle.

52.    Ghafoor gave the UCE an additional $200 cash, presumably from the ATM transaction.  Ghafoor said that it was only $200 because the person who sent the money "took $50."  Ghafoor directed the UCE to send the money from the envelope via cryptocurrency that day and then wait two days before sending the rest of the cash.  Ghafoor believed that breaking up the transactions into smaller amounts would serve as operational security.

53.    Ghafoor instructed the UCE to send all the money to the same cryptocurrency wallet number that Ghafoor provided to the UCE.  The UCE explained to Ghafoor that it would take a few days, but that the UCE would make the transaction as soon as possible.  Ghafoor asked the UCE for an estimated time.  The UCE responded the transactions should be done within a week.

54.    Ghafoor talked with the UCE about his support of ISIS and whether others knew of Ghafoor's support of ISIS.

55.    The UCE inquired if the cryptocurrency wallet was an official "Waliya"[6] wallet. Ghafoor responded that it was not.  Ghafoor explained the money was going to a "munasir"[7] group in Syria, which, in turn, was operating in support of ISIS.  Ghafoor reiterated that the UCE should wait two days between the transactions.

56.    On or about May 18, 2026, the UCE told Ghafoor that the UCE converted the cash to cryptocurrency and sent it to the wallet Ghafoor provided.  Ghafoor responded, "BRO THANK

---

[6] I know from my training and experience that "Waliya," in this context, refers to "the state."  ISIS refers to themselves as "the State."

[7] I know from my training and experience that "Munasir," in this context, refers to a "helper" or "supporter" who may have worked for ISIS without swearing an allegiance or oath to that organization.

YOU BARAKALLAH FEEK."[8] The next day, Ghafoor confirmed to the UCE that the cryptocurrency funds got delivered. Ghafoor added, "You fed a mujahid wallah."[9]

57. On the same date, Ghafoor told the CHS that the UCE sent the $250 and inquired if CHS received the funds. Ghafoor then told the CHS that he planned to send more money in the future.

58. On or about May 21-22, 2026, Ghafoor and the CHS communicated again. Ghafoor told the CHS that the additional $200 was sent to the CHS's cryptocurrency wallet. Ghafoor explained that some of the money was from Ghafoor and some of the money was from Dzayee. Ghafoor expressed regret for not being able to send the CHS more money. Ghafoor requested that the CHS close the cryptocurrency wallet.

59. Ghafoor asked the CHS, "how many do you hope to kill?" Ghafoor said he has always wanted to kill a female soldier by beheading. Ghafoor added, "I wish I could kill 300,000,000 Americans" and "they don't know that the Dawlah is around them." Ghafoor asked about specifics regarding the timeline of the CHS's mission. In response to a photograph containing an ISIS flag, Ghafoor said, "I wish any ajami[10] that refuses to kneel before this flag would have their heads immediately crushed by hydraulic press."

60. On the same date, Ghafoor messaged the UCE stating, "Brother it got through" and "I swear by the Almighty, that this was indeed used for Dawlah's sake."

---

[8] I know from my training and experience that "Barakallah Feek" means "May Allah Bless You."

[9] I know from my training and experience that "Mujahid" is an Islamic term for someone who engages in "jihad," meaning one who struggles, strives, or fights in the cause of Allah or to overcome personal trials.

[10] I know from my training and experience that "ajami" is an Arabic term likely referring to someone from Iran or of Persian descent. Due to Bisaam's lack of formal training and education in Arabic, I believe that he may have intended to type "ajmi" instead of "ajami."

61.    On or about May 22, 2026, Ghafoor sent a message to the UCE requesting the UCE to delete any wallets used for the transactions.  Ghafoor explained to the UCE that he requested the CHS to do the same.  Ghafoor believed that deleting the wallets would reduce the chances of money being traced back to them.  Ghafoor then instructed the UCE to keep a "low-profile."

62.    On or about May 23, 2026, Ghafoor asked the CHS how soon "it" was going to happen.  The CHS explained that the time of the operation was not up to the CHS.  Ghafoor discussed United States Green Berets and the plan for attacking them.  Ghafoor commented that if 20 Americans were killed, the event would make the news.  Regarding the money sent by Ghafoor and Dzayee, the CHS asked if Ghafoor and Dayzee each sent $225.  Ghafoor responded and confirmed the amounts sent to the CHS.

63.    On the same day, Ghafoor told the UCE, "They are confirmed to be closing it, we really got away with this.  Committed grand treason and literally got away with it.  Once these messages disappear in a week, there's not gonna be any record of us doing this, at least none can be traced back to us.  At least none can be traced back to you, for me they sent me a message of my name written down on a canister.  They're planning to use on some Americans."

64.    The CHS sent Ghafoor the following image depicting firearms and RPGs that purportedly were to be used to kill U.S. servicemembers. One of the RPGs contains Arabic writing on the projectile end of the RPG. The Arabic writing translates to Bisaam Shahzad Ghafoor.



## B. Shamsaldeen provided money to the CHS.

65.    On or about May 6-8, 2026, the CHS communicated multiple times with Shamsaldeen about Shamsaldeen sending cryptocurrency to the CHS to purchase drones, which would be used by ISIS against members of the United States military deployed overseas. Shamsaldeen wanted to transfer funds to the CHS in a manner that would not expose Shamsaldeen as providing the funds. Shamsaldeen said that he would locate a cryptocurrency ATM away from his home to further distance himself from the transfer of the funds so they could not be traced back to him.

66.     On or about May 12, 2026, Shamsaldeen told the CHS that he traveled to a cryptocurrency ATM to send the funds to the CHS. However, Shamsaldeen did not make the purchase because he had to create an account and provide an identification, so he did not follow through on the plan.

67.     On or about May 12, 2026, FBI agents conducted surveillance of Shamsaldeen as he traveled from his residence to a gas station more than ninety miles away. Agents confirmed a cryptocurrency ATM was inside the gas station.

68.     On or about May 26, 2026, the CHS explained to Shamsaldeen that another participant in the social media platform group successfully sent money overseas through an intermediary. Shamsaldeen asked the identity of the intermediary. The CHS responded that information could not be given at that time.

69.     From on or about May 26-30, 2026, Shamsaldeen and the CHS continued their conversation about Shamsaldeen providing funds to support ISIS. Shamsaldeen stated he wanted to send money to support ISIS. Shamsaldeen explained that he had money in a financial application, which he could send.

70.     On or about May 30, 2026, the CHS sent Shamsaldeen a link so Shamsaldeen could send the funds. Eventually Shamsaldeen successfully sent approximately $1,590 to the UCE's account[11] to support ISIS. Shamsaldeen thanked CHS for the opportunity to provide the money.

71.     The UCE took screenshots of the transactions with a sample below.

---

[11] Unbeknownst to Shamsaldeen, the transfer went to a different FBI employee that was acting as the UCE.

17



72.    Based on the foregoing, I believe there is probable cause to believe that on or about February 1, 2025, and continuing through in or about June 5, 2026, the dates being approximate and inclusive, in the District of Kansas and elsewhere, Ghafoor, Shamsaldeen, and Dzayee conspired to provide material support and resources to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B.

*s/ Kyle Heitman*
Kyle Heitman
Special Agent
FBI

Sworn to before me and subscribed this 4th day of June 2026, at Kansas City, Kansas, pursuant to Fed. R. Crim. P. 4.1.

After reviewing this Complaint, I find there is probable cause to believe that defendants,

Bisaam Ghafoor, Bareen Dzayee, and Elias Shamsaldeen committed the offense set forth above.

_____
HONORABLE JENNIFER B. WIELAND
United States Magistrate Judge

19

## **PENALTIES**

**Count 1:  18 U.S.C. § 2339B(a)(1)**

- Punishable by a term of imprisonment of not more than twenty years.  18 U.S.C. § 2339B(a)(1).

- A term of supervised release of not more than life.  18 U.S.C. § 3583(j).

- A fine not to exceed $250,000.  18 U.S.C. § 3571(b)(3).

- A mandatory special assessment of $100.  18 U.S.C. § 3013(a)(2)(A).