IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA (FRESNO)

UNITED STATES OF AMERICA, . Case No. 1:26-MJ-00068-FJS

Plaintiff,

vs.

ELIAS SHAMSALDEEN,

Defendant.

. Friday, June 12, 2026
. . . . . . . . . . . . . . . . 2:26 P.M

TRANSCRIPT OF DETENTION HEARING
**BEFORE THE HONORABLE ERICA P. GROSJEAN**
**UNITED STATES MAGISTRATE COURT JUDGE**

APPEARANCES:

For the Plaintiff: United States Attorney's Office
BY: CODY CHAPPLE, ESQUIRE
2500 Tulare Street, Suite 4401
Fresno, California 93721
(559) 497-4000
Cody.chapple@usdoj.gov

For the Defendant: Wanger Jones Helsley PC
BY: PETER MICHAEL JONES, ESQUIRE
265 East River Park Circle, Suite 310
P.O. Box 28340
Fresno, California 93720
(559) 233-4800
pjones@wjhattorneys.com

Electronic Court Recording Operator: Otilia Rosales
Robert E. Coyle U.S. Courthouse
2500 Tulare Street
Fresno, California 93721

Transcription Service: Liberty Transcripts
9107 Topridge Drive
Austin, Texas 78750
(847) 848-4907
DBPATEL1180@GMAIL.COM

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

(Proceedings commenced at 2:26 p.m.)

THE COURT: Next is United States versus Elias Shamsaldeen, 26-MJ-00068. We're here for a detention hearing. Let me take appearances starting with Defense Counsel.

MR. JONES: Good afternoon, Your Honor.

Peter Jones for Elias Shamsaldeen. He is present in court in custody.

THE COURT: Thank you. Good afternoon, Mr. Jones.

Good afternoon, Mr. Shamsaldeen.

And for the United States?

MR. CHAPPLE: Good afternoon, Your Honor.

Cody Chapple for the United States.

THE COURT: Thank you. And good afternoon, Mr. Chapple. We're here for a detention hearing. I have received a report and recommendation from Pretrial Services. Pretrial Services has recommended release on conditions.

In light of that, could I first hear from the Government, Mr. Chapple?

MR. CHAPPLE: Yes, Your Honor. So the Defendant here has been arrested for conspiracy to provide material in support and resources to a terrorist organization. The Defendant is involved in an online group whose purpose is to recruit and raise resources for ISIS. The Defendant here became involved in the group no later than May 2025. And while in this group, so this is mostly on Discord where they're communication, which

is an online messaging board and people can talk to each other either live or on messaging boards over time, or on video, like livestreaming-type stuff, or FaceTime.

So he's part of this group. In May 2025, he expresses a desire to injury U.S. service members, specifically stabbing or killing United States military service members who had recently entered his place of business.

THE COURT: Is he talking about specific members, individuals, or just I want to do something to service members generally?

MR. CHAPPLE: No, the latter, Your Honor. Just generally, yes.

THE COURT: Okay.

MR. CHAPPLE: But this is again back in 2025.

THE COURT: Okay.

MR. CHAPPLE: And so his involvement and actions and conduct increase after that. So I'm just --

THE COURT: Okay.

MR. CHAPPLE: -- that's how it starts. At some point, someone tips the FBI off of this language in this Discord group. An undercover FBI agent becomes part of this group and monitors what this Defendant is doing. Later, August 2025, the Defendant begins to express a desire to take action, not just express his beliefs on ISIS or the United States, but he wanted to take action for a law.

He talks -- he in October of 2025, goes into more of a recruiter or a higher-up role where he is trying to recruit others into this organization or get people to pledge allegiance, which is called "bay'ah" to ISIS. And so that would be pledging allegiance to the commander and faithful caliph of the Muslims, Sheikh Abu Hafs al-Hashimi al-Qurashi.

And he would go on these messaging boards to talk to other individuals and frequently do livestreams where he's just in front of his computer and he's talking to these individuals to raise money, to raise resources to talk about assisting groups overseas. And then in October of 2025, he talks about purchasing a firearm. He goes to the Bakersfield Gun Show on October 23, 2025 called the Crossroads of the West Gun Show, purchases a 45-caliber semi-automatic handgun, and then goes on to use this -- the gun and the ammo he purchased in his livestreams as part of the recruitment process.

And I actually have pictures or screenshots from that. If I may approach?

THE COURT: Okay. Please.

Thank you. Okay.

MR. CHAPPLE: He also in November of 2025, during a discussion with others on the Discord group, discusses ways to kill large amounts of people. Specifically, he suggests waiting for a parade where a few dozen could be killed. So this is what's going on in the Discord group. They're trying

to raise money, they're recruiting others, and then they're encouraging others to take action on their beliefs or to harm people in the name of ISIS or whatever their belief is.

So this continues until December 2025. Another escalation of his involvement in this group, he starts opening up bank accounts with a credit union in California using his driver's license and social security number. And later, in March of 2026, these accounts receive unauthorized credit amounts totaling $7,500. That is immediately put into a cash app and then sent to an unknown account. And this is important because later the other members of the group, the other members charged in the complaint, are more involved on the fraud side of this conspiracy.

So what they're doing is they're purchasing accounts, passwords, bank accounts, passwords on the dark web. They're using that to get into accounts to get -- to take money out of. I don't know all the details on that, but they're able to take some money out and then use others who have opened up bank accounts to transfer the money quickly and then they would then send it out to a different account or purchase crypto with it and then send it out through there.

So his involvement started ramping up and he actually started giving money to the group that he wasn't, it's not like he's working and making this money. This is fraud proceeds coming into his accounts and then he would transfer for the

benefit of the group.

Later in May of 2026, or May 12, 2026, he starts taking the money out and going to crypto ATMs, which are like ATM machines that you deposit money into. You get a crypto amount and then you can do whatever you want in that crypto space and transfer it to different wallets. So he drives 90 miles and this is all part of his concealing his conduct and his identity in this conduct. He drives 90 miles out of Porterville where he lives to Tehachapi, California, where there's a crypto ATM.

He goes to deposit about $1,600. But when he's confronted with, he had to make an account using his real ID and real information, at that point, he abandoned his plans and left. About two weeks later, however, he's conversing with an individual online who is an undercover FBI agent about moving the money to ISIS so that they can buy drones to use against the United States in the Middle East and elsewhere. And so that's the goal, his stated goal for moving this money to this organization.

He ends up doing that through a cash app where he sends it to the account controlled by the FBI, unbeknownst to him. At first, he tries to transfer the full $1,600, but it's flagged for fraud. He then makes about 50 small $100, $200 transactions that gets below the app's detection system and is able to move all $1,600 that way. He then thanks the

undercover for what he was allowed to do, and he's happy for the opportunity to do this to provide the resources to ISIS, which is what he believes throughout this whole process that he's doing.

So I think that was the most recent, at the end of May, and then he's arrested on the complaint. So all this is extremely concerning to the United States.

THE COURT: Let me ask a little bit more about the factual allegations. Let's start with just him. What's the most specific plan that you think that he did? An actual person, an event, just, I know there's kind of terrorist ideology generally. Then I appreciate, you know, talked about like a parade with people, but just that, my kind of open-ended question, what do you think is the most specific intent that he exhibited?

MR. CHAPPLE: I think the money transfer, obtaining these, what he knows is not legitimate proceeds.

THE COURT: What about on violence?

MR. CHAPPLE: Violence --

THE COURT: Does he have a specific location, a date, a person that you know of so far?

MR. CHAPPLE: No, Your Honor.

THE COURT: Okay, and then what about when he's directing others, and he's encouraging? How specific does that get?

MR. CHAPPLE: It's not -- it doesn't get to the point of, you know, dates, locations, and actually carrying it out. This is more of a, it's online, he's online, and he's advocating for it generally. I don't know the details of how he's communicating it, except for, you know, what I've --

THE COURT: Okay. And I'm not trying to minimize that in any way. I mean, obviously, I'm going to be thinking about what the risk of danger is and whether it can be mitigated by these conditions. So that's my reason for asking.

Okay, do you want to continue with your argument?

MR. CHAPPLE: Yes, Your Honor. So that is why, one, it is so concerning. The purchasing the firearm, I think, is a significant step towards some kind of action. The transferring the money to a group he thinks is going to eventually go to ISIS, and so that they can purchase weapons to use against the United States. Those are the biggest thing, but that connected with his words and communication, I think, makes this very, very concerning.

The fact that he's been concealing his identity or trying to conceal the money movements throughout all this is concerning. He has ties overseas and has expressed a desire to go overseas himself. He has the means to go overseas. He does have a passport.

So based on all this, the Government would ask for detention based on risk of flight and danger.

THE COURT: Mr. Jones.

MR. JONES: Thank you, Your Honor. Obviously, I have received the complaint and affidavit. That's the extent of what I know about the case. Mr. Chapple's added some information I was unaware of. Usually the affidavit includes the most salient, the most persuasive, the most significant circumstances that the Government's offering in support of the complaint.

What I'm reading is, and I'm going to come back to this because I'd like to talk about my client's family a little bit first, and I will come back to this. But he's on a social media platform beginning somewhere in March, April, or May of 2025, and there are others involved and the confidential informants involved who reaches out to the FBI and together they began monitoring the conversations, the discussions, and activities of and I don't know the extent of that. I haven't received a discovery, obviously, but at least of the three Defendants in the complaint.

And I do know the affidavit dwelled more heavily on the other two co-Defendants. But I want to get back to that. I want to talk about my client a little bit and his family and specifically what's been going on with him and why I believe the recommendation of Pretrial Services is appropriate.

Obviously, my client's young. He's 21 years old. He has never been arrested. He has no record. He's been

attending college. He had a 3.1 grade point average, associate's degree in math, enrolled to go to California State University to pursue his civil engineering degree.

However, about the same time he became attracted to the social media platform and was talking and exchanging views and opinions and listening to others opining about certain things, his parents noted an emerging what they saw as a mental illness. Just the emerging symptoms of it and it came to a head in February where they had him placed under a 5150 hold because of their concerns about his mental health and he began not immediately getting intense therapy, but it was beginning about the time that he was arrested on this and he is now he is taking Seroquel now for his mental illness.

THE COURT: So when did he start therapy?

MR. JONES: I wrote it down and his father and mother can talk about this, but there were -- he saw a psychiatrist on several occasions after the 5150.

THE COURT: Okay, do you want to find that out and also when he started taking Seroquel?

MR. JONES: Oh, certainly.

THE COURT: If you're willing to disclose that.

(Pause)

MR. JONES: Thank you, Your Honor.

THE COURT: Okay.

MR. JONES: Seeing a psychiatrist, her last name's

Samrod (phonetic). He saw her three times. She kept increasing his dosage from March until he didn't get up till 300 milligrams until about a month and a half ago.

THE COURT: Okay.

MR. JONES: And as you can see his family is here. He has a very very close-knit, tight-knit, supportive family. His mother's here, his father's here, his uncle's here, another relative, his father's cousin's here, all of his siblings are here. His brother, who I was talking to, Abdul, has his Bachelor of Science degree in finance and accounting and is pursuing his CPA at this time. He's 24 years old.

His sister, Amina, is here. She's graduating from high school or just graduated from high school with a 3.8 grade point average. As I mentioned, Elias himself was pursuing a civil engineering degree. The Pretrial Report summarizes his family's circumstances, but they're very close-knit, very law-abiding. There is no criminal history whatsoever here. Just incredibly supportive. They're ready to post a cash bond if they are allowed to, ready to cooperate and abide by any conditions the Court sets for Mr. Shamsaldeen.

He -- according to everyone I talked to, his brother and mother, father, anyone who's observed him, he's always followed what his parents tell him to do. He's obedient. He's a good candidate for someone to be placed in the home on conditions, in combination of conditions. They will make sure

he's in Kansas when he needs to be in Kansas. They have no qualms about that and will advise the Court. His father, Eyad, will advise the Court of that. His father works full-time, but he will make whatever arrangements he needs to comply with that.

So we have a young man from a very, very strong family unit. And I want to go back to the facts and circumstances that I'm aware of from the affidavit, but it was verbal. It was talking. I saw nothing of any specificity. It was generic. I didn't see any other actual monetary disbursements. There were attempts but the one that I read was the $1,590 made in small increments to a link that the confidential informant received from the FBI agent and provided to him, and that's where the money was sent. So there was that link that was provided that led to the disbursement of the money.

I understand the Government's concerns, but this is an individual who could without question be released because of his family, and strict conditions of taking his medication, continuing with his counseling, and obviously his passport's going to be taken. Whatever -- the Pretrial Services noted there are no firearms in the home anymore, and I believe that the recommendation in this case is very appropriate.

THE COURT: Pretrial Services?

MR. BECKWITH: Good afternoon, Your Honor. Ryan

Beckwith with Pretrial Services.

THE COURT: You have some restrictions on the internet. Can you tell me a little bit more technically how that's going to work?

MR. BECKWITH: After speaking with the Defendant's father, it was my understanding that the Government has already confiscated the devices that he previously owned. Going forward, the plan that I proposed to the family and recommended would be that he would have a laptop that would be available to him for the purposes of school only.

We would be able to install monitoring software on that laptop, so we would be getting reports every time he does anything on the laptop. His father, the proposed third-party custodian, is also willing to monitor the use as well, in addition to our own software, ensuring that he doesn't get any other devices. In addition to that, the other devices in the homes would have to be password-protected, which is what we normally do in these situations, to ensure that the Defendant would not be able to access the internet as much as possible.

THE COURT: I think you didn't propose location monitoring, but if I wanted some location monitoring, let's talk a little bit about what might make sense. On one hand, home detention makes some sense, and you could see at home and he would only leave for pre-approved. On the other hand, maybe a combination. GPS has more oversight for where he is.

I mean, the most extreme danger that I think is here is him actually participating in violent actions. And I think my guess is that the Government would like some desire to really know where he is, even outside the home. Have you given some thought to that? I know you didn't propose it, but if we went something like that, what do you think?

MR. BECKWITH: If the Court is inclined to impose some type of monitoring, we could do some -- we could do GPS along with home detention. That way, we ensure he's only leaving the house to attend school. Something along those lines, Your Honor.

THE COURT: Okay. Do you have any more you want to add now?

MR. BECKWITH: Nothing further to add in regard to conditions. Just to give the Court a little bit of insight on our line of thinking with this. I did speak with the family. I spoke with the mother, the father, the brother. To reiterate what Defense Counsel represented, he has tremendous family support. I had a great conversation with all three of them.

They're here to support the Defendant. They understand his struggles, but they also understand the gravity of the situation. They understand the allegations that the Government is making, and they're here to support the Defendant.

THE COURT: What about the mental health part? It

sounds like he did have a 5150 sometime earlier this year, and that means that there was some thought that he was, at that time, a danger to himself and others. I see here there's some reports of schizophrenia. How did that weigh, and as part of the conditions, do you know if he is going to have mental health services?

MR. BECKWITH: Yes, Your Honor. We would propose that he attend mental health counseling while he's on pretrial release. We would have him assessed as soon as he's released, and they would determine how often he needs to be released. It could be as much as once a week, twice a month. It's really going to depend on how he does during that evaluation.

THE COURT: So that's what's contemplated by the Condition 11, participate in a program of medical or psychiatric treatment?

MR. BECKWITH: Yes, Your Honor.

THE COURT: Okay. Back to you, Mr. Chapple.

MR. CHAPPLE: Yes, Your Honor. I think the only thing I would add that I forgot to mention is to talk about the mental issues.

Schizophrenia is a difficult disease, and it's not easy to live with under normal circumstances. I think it makes it very difficult with that particular disease to comply with the Court's conditions, because one day without the medication and something could happen, something can change. I know the

fact that he had a 5150 and was detained because of a psychiatric condition is extremely concerning.

I didn't see that in the Pretrial Report, but I may have missed it. That is very concerning, especially because he recently purchased a firearm, knows how to get a firearm, and was able to do it at a gun show, which is a method he can do -- he can go without much -- I don't know how much they go into his background in terms of like mental issues, now that it's, I guess this happened at the beginning of this year, and he purchased the gun in October of last year.

But I think the fact that he actually purchased the gun, he knows how to get a gun, and in that specific way, it's very concerning, and the fact that his mental condition and schizophrenia makes it, I think, very difficult to comply with the conditions this Court is going to impose over the length of his pretrial confinement or status.

THE COURT: Mr. Jones.

MR. JONES: Yes, Your Honor, thank you. He only recently was elevated to 300 milligrams of Seroquel. The condition's going to be that he takes his medication and consults with his psychiatrist or what counseling Pretrial recommends. House arrest and, of course, location monitoring is very sophisticated, and his parents are very dedicated to complying with whatever the Court advises them to do.

His father will -- there's no question, if there's an

issue, they're going, they will let the Court know, let Pretrial Services know immediately. But I believe that there's no concern simply because he was diagnosed with that, that he is going to be violent. I think that would be kind of discriminatory in some way.

THE COURT: Okay. Can I hear from the proposed third-party custodian, his, I think it's his father, Eyad Shamsaldeen? Can you come up and really, and any microphone would be fine. You can stand next to Mr. Jones, maybe up there. Okay, can you introduce yourself, please?

MR. SHAMSALDEEN: Thank you, Your Honor.

My name is Eyad Shamsaldeen.

THE COURT: Okay, and what is your relationship with Mr. --

MR. SHAMSALDEEN: I'm the father for him, yes.

THE COURT: Do you live with him?

MR. SHAMSALDEEN: Yeah, we live with him.

THE COURT: Okay. Do you know you're being proposed as a third-party custodian?

MR. SHAMSALDEEN: Yes, ma'am.

THE COURT: Okay, and you know what the charges are?

MR. SHAMSALDEEN: Yes.

THE COURT: Okay.

MR. SHAMSALDEEN: Yes, ma'am.

THE COURT: What can you tell me about your ability

to supervise Mr. Shamsaldeen? What would you really be able to do to supervise him on a day-to-day basis? How much interaction do you have? Tell me a little bit about your abilities to do that.

MR. SHAMSALDEEN: We -- we all the time when you ask him something, he listens and he takes the medicine and he's fine with it.

THE COURT: Okay. Do you know that if you agree to this, then if you see that he is violating any terms of conditions, that you're taking independent obligation to report that to Pretrial Services or to the Court?

MR. SHAMSALDEEN: Yes, Your Honor.

THE COURT: And also, both because it would be part of your role here but also, given the severity of this, if you ever had cause to believe that he would be a danger to himself or anybody else, would you report that to Pretrial Services or to the Court?

MR. SHAMSALDEEN: Yes, Your Honor.

THE COURT: Were you part of what checked him in for a 5150 earlier this year?

MR. SHAMSALDEEN: I'm the one -- he go himself.

THE COURT: He did it himself?

MR. SHAMSALDEEN: Yeah, I go take him from there.

THE COURT: You took him in. Okay. But you know, is it fair to say you do know how to also report and take him for

help if you think that he might be a danger?

MR. SHAMSALDEEN: Yes. Yes, Your Honor.

THE COURT: Okay, you can sit down. Thank you.

MR. SHAMSALDEEN: Thank you.

THE COURT: Okay, Mr. Jones, anything further?

MR. JONES: No, Your Honor.

THE COURT: Mr. Chapple?

MR. CHAPPLE: No, Your Honor.

THE COURT: Pretrial Services?

MR. BECKWITH: Just one thing to add, Your Honor. If the Court is inclined to release the Defendant, do we have possession of the passport yet?

THE COURT: Yeah, let's talk a little bit about --

UNIDENTIFIED SPEAKER: Yes.

THE COURT: Well, that's a good question. I think as we move to conditions, do you know who has the passport and how soon he can get it? Do they have it here today? Oh, okay. So he already has the passport. Good.

Okay, so let me make my finding and then we'll work out conditions. I do think that there are conditions that would reasonably assure the safety of the community and his appearance. I take very seriously the allegations that are here. I think we all do in this room. The Government does, and I think that his family does as well. And so I have to make sure that there are conditions that would assure and, in

particular, the safety of the community.

And I do know that he doesn't have employment, and there are some indications that he might not have well stability in his life. And the allegations are that he was part of and expressed intent to do violence. On the other hand, he has no criminal history at all, no arrests or anything.

He's born in the United States. He's a longtime resident of Tulare. He does have a third-party custodian, and I spoke to him on the record, who has supervision of him. And it appears that he has had issues in the past that he has gotten help for his son and is consulting with mental health professionals. That shows that he has some supervision and would be able, hopefully, to see signs that this danger might come to fruition.

I also see, even though he's unemployed, he was part of Cal State University. So I think that there are conditions that would reasonably assure the safety, but I want to add some. I want location monitoring. I'd like a GPS monitor so that it is known where he is at all times. And in addition, we'll have home detention. And Mr. Beckwith will read more specifically what that is what he can be released for, but I think he can be released, for example, for employment or school, but -- and for pre-approved purposes, but otherwise stay in the house.

Do we -- I don't know if it's needed, I was thinking of maybe having that he can't go to any gun stores. We're going to know from GPS, and one of the concerns for Mr. Chapple is that he would be able to purchase a gun. Is that something possible, so that itself would trigger a violation?

MR. BECKWITH: If anytime he's given permission to leave the residence, Your Honor, it will be to a specific location at a specific time.

THE COURT: Okay.

MR. BECKWITH: If he deviates from that track, the officer will notify the Court.

THE COURT: Okay, I think that that's probably -- that's probably good enough. And I also do appreciate that there's a lot of limitations on his internet access that would still allow him to go to school and do his life activities. But I do think that those conditions are will assure the safety of the community and his appearance.

Okay, Mr. Beckwith, do you need any moment to revise those, or you think you're ready?

MR. BECKWITH: Just one thing to add, Your Honor, this will be a delayed release until Monday morning, just because we're going to have to get a specialist available to hook him up on that date.

THE COURT: Okay, thank you.

MR. BECKWITH: The Defendant will be released on his

own recognizance with Pretrial Services supervision and the following conditions of release. You must report to and comply with the rules and regulations of the Pretrial Services Agency. You must report to the Pretrial Services Agency immediately upon your release from custody.

You are released to the third-party custody of Eyad Shamsaldeen. You must reside at a location approved by the Pretrial Services Officer and not move or absent yourself from this residence without the prior approval of the Pretrial Services Officer. You must cooperate in the collection of a DNA sample.

You must restrict your travel to the Eastern District of California and the District of Kansas for court purposes only, unless otherwise approved in advance by the Pretrial Services Officer. You must surrender your passport and not apply for or obtain a passport or any other travel documents during the pendency of this case. You must not possess, have in your residence, or have access to a firearm or ammunition, destructive device, or other dangerous weapon.

Additionally, you must provide written proof of divestment of all firearms and ammunition currently under your control. You must report any contact with law enforcement to your Pretrial Services Officer within 24 hours. You must not associate or have any contact with co-Defendants unless in the presence of counsel or otherwise approved in advance by the

Pretrial Services Officer.

You must participate in a program of medical or psychiatric treatment or individual specialized treatment as determined by the Pretrial Services Officer. You must pay all or part of the costs of the counseling services based upon your ability to pay as determined by the Pretrial Services Officer. You must report any contact with law enforcement to your Pretrial Services Officer within 24 hours.

You must not access the Internet and you must provide proof of the disconnection or termination of this service as required by the Pretrial Services Officer. You may only access the Internet for school purposes only. You must not use or possess a computer or any device capable of accessing the Internet in your residence or at any other location unless otherwise approved by the Pretrial Services Officer.

You may use one computer for school purposes only. You must participate in a computer restriction and monitoring program as directed by the Pretrial Services Officer. You must allow the Pretrial Services Officer to install monitoring software on any computers to which you have access as approved by the Court and you must not remove, tamper with, or in any way circumvent the software.

You must participate in the following location monitoring program component and abide by all the rules and requirements of the program, which will include having a GPS

device attached to your person. You must comply with all instructions for the use and operation of said devices as given to you by the Pretrial Services Agency and employees of the monitoring company. You are responsible for the management of the equipment and you must charge the battery daily.

You must pay all or part of the costs of the program based upon your ability to pay as determined by the Pretrial Services Officer. You will be subject to home detention and you must remain inside your residence at all times except for employment, education, religious services, medical, substance abuse or mental health treatment, attorney visits, court appearances, court-ordered obligations, or other essential activities pre-approved by the Pretrial Services Officer. Essential activities include haircuts, DMV appointments, banking needs, or other activities that cannot be completed by another person on your behalf.

Your release on bond is delayed until Monday, June 15, 2026 at 8:30 a.m., at which time you must report directly to the Pretrial Services Office in Fresno, California for the installation of the location monitoring equipment.

THE COURT: Okay, so is there a waiver for an identity hearing?

MR. JONES: A waiver is --

THE COURT: Okay. Yes?

MR. JONES: -- submitted, yes.

THE COURT: Okay. So I'm going to note a waiver of an identity hearing. And I think we need a report date in the charging district. Do you have anything in mind?

MR. CHAPPLE: Yes, Your Honor. So the courthouse is located at 500 State Avenue Street -- or sorry, Avenue, Kansas City, Kansas 66101. We would ask for him to report on June 29th or by June 29th by 11:00 on the duty calendar.

THE COURT: Okay. Is that okay with you, Mr. Jones?

MR. JONES: Yes, June 29th in court or --

THE COURT: I think it's by that -- so do you know, Mr. Chapple, is that when the duty calendar is? So if he goes there at June 29th at 11 a.m., will that work?

MR. CHAPPLE: That's my understanding, Your Honor. Yes.

THE COURT: Okay, so on or before June 29th at 11 a.m. in United States District Court for the District of Kansas.

Okay, is there anything further today for Mr. Shamsaldeen?

MR. CHAPPLE: One more thing, Your Honor. I've been asked by the Prosecutors in Kansas to ask for a stay and they're intending to seek one in their district.

THE COURT: Okay, how long do you need?

MR. CHAPPLE: I think Monday would be fine.

THE COURT: Okay, so we're staying release until

Monday at 4 p.m.?

MR. CHAPPLE: Stay the release order, yes, and then I think 4 would be fine or --

THE COURT: Okay. So maybe we should change the condition to the working day after his release because it's possible it won't happen. If, for example, they don't get a further stay, it'll be he gets released on Monday and he'll come in on Tuesday for location monitoring.

MR. JONES: Could we change the order till Tuesday at 8:30 a.m., Your Honor? That way, whether it's filed or not, we're safe?

MR. CHAPPLE: My understanding is they will be filing today, Your Honor, the stay.

THE COURT: And then it'll be --

MR. CHAPPLE: Yeah.

THE COURT: And if they -- but if they decide not to overturn it and they let it stay or let it remain in place, it sounds like we should have language that if he gets released, the next business day he goes to get GPS.

MR. CHAPPLE: Yeah, I --

THE COURT: So I think it should change. Instead of a date certain, I think it should be the day after his release he has to report to Pretrial Services.

MR. JONES: The only issue is that if he got released on a Friday, we would --

THE COURT: Next business day, then.

MR. JONES: The next business day --

THE COURT: Yeah.

MR. JONES: -- following his release from custody?

THE COURT: I think we need that.

MR. JONES: Okay.

THE COURT: So I think you understand, but what it means is that he's not going to get released even Monday morning. They're going to ask the judge that is in the District of Kansas if they want to change my decision, and it'll probably go to a district judge there. So if they change the decision, he could still be detained. If they say uphold my decision, then I think we need language that the day after that he goes to report for location monitoring.

MR. JONES: Okay.

THE COURT: Okay.

MR. CHAPPLE: Yes.

THE COURT: So that order of release is stayed until Monday at 4 p.m., unless further extended.

Mr. Jones?

MR. JONES: Yes, thank you.

THE COURT: Procedurally, so they're going to file to move for the District Court in Kansas to overrule this Court's decision. How soon do we expect that to be?

THE COURT: Do you have any understanding?

MR. CHAPPLE: I think -- I don't know when the court will issue the order. I know that they're going to seek -- they're going to file the stay this evening or afternoon over there. And so I would assume that the Court would issue an order if they do by Monday.

THE COURT: But I think that's just staying it.

MR. CHAPPLE: Yes.

THE COURT: I don't know how soon you get a new detention decision.

MR. JONES: They would have to transport my client to Kansas, then, if it's --

THE COURT: Do you think they transport --

MR. JONES: If there's a stay.

THE COURT: They stay it for him going over to have a hearing over there?

MR. CHAPPLE: If they -- yes, they could. It could be either that he's released on conditions and then required to appear there for another detention hearing. But I think what I've typically seen is he's temporarily detained until --

THE COURT: Okay.

MR. CHAPPLE: -- if the judge orders. I don't know what's going to happen.

THE COURT: Okay. So what's most likely -- Mr. Jones can explain to the clients later. What sounds most likely is going to happen is that the District Court in the District of

Kansas today or Monday will issue something staying my order and requiring that he get transported to the District of Kansas, which takes several weeks. And then he will have a hearing there before a judge there, I think a district judge there, about this detention decision.

Okay. Is there anything further today for Mr. Shamsaldeen?

MR. CHAPPLE: No, Your Honor. Thank you.

MR. JONES: No, Your Honor.

THE COURT: Okay. Thank you all. Thank you very much, and Court is adjourned. Thank you.

(Proceedings were adjourned at 3:10 p.m.)

* * * * *

CERTIFICATE

I, DIPTI PATEL, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and transcribed to the best of my ability.

____________________________

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts Date: June 23, 2026